Page 124-1193, et al. Chamber of Commerce of the United States of America, et al. Petitioners v. Environmental Protection Agency, and Liam Dalene, in his official capacity as Administrator, United States Environmental Protection Agency. Mr. Lin, for the petitioners. Mr. Walters, for the respondents. Mr. Collins-Katz, for the respondents. Good morning. Good morning, and may it please the Court. Albert Lin, on behalf of petitioners. There are several independent errors that require vacature, with EPA's rule designating PFOA and PFOS as hazardous substances under CERCLA. But I'd like to start with noticing comments, as we believe that is the most glaring error, and would, standing alone, require vacature. Under this Court's longstanding critical information precedent, it is a violation of the EPA's noticing comment requirement when an agency introduces in the final rule new methodologies, conclusions, or data that does more than simply support prior disclosed data. EPA ran afoul of those precedents here when it introduced, with its final rule, a brand new totality of the circumstances analysis supported by a new 300-page regulatory impact analysis that, at J387 to 389, weighed 29 different impact categories in comparing the advantages and disadvantages of the rule. What's the study that you think EPA should have disclosed in the notice? It's not a study, per se. I mean, you're saying they didn't disclose the RIA. But yeah, sure, the RIA is the product of the ruling. Of course. The rulemaking will never come to an end if the end product has to be disclosed at the outset. There are six different methodologies, assumptions, and quantitative analyses that they undertook. So I don't think it has to be a study, per se. I think if you look at the owner-operator case from this Court, it talks about a methodology that was used. It's not a specific study. So I could go through all six of them, but I'll just start with just a couple. I mean, the first is the EPA concluded that they would entirely ignore costs at federal Superfund sites. In this, it said that it seemed- But they told you, on the front end of the rulemaking, there is a unitary question. Designate or no designate? It's an on-off switch. They proposed to do it, and they invited comments about whether costs should be considered, what costs should be considered. All of those questions, they teed up. And you all- And they didn't- This is not a case where they have studies in their files that they're hiding. They quite reasonably expressed uncertainty. How in the world can you precisely quantify all this stuff? And they solicited input. And you all had every opportunity in the world to comment. I think that's the difference between the logical outgrowth doctrine and the critical information doctrine. I think the Chamber of Commerce versus SEC case, 2006 of this Court, makes that clear where it says that there was what this Court called a bare request for comment on a potential change to the cost-benefit analysis. And the Court said that that wasn't enough because the agency- That might be enough for logical outgrowth when this covering manufacturers case in 2023 distinguishes between the two. It says there was no logical outgrowth problem there, but there was a critical information problem. And here, yes, they asked for comment on, do we have to consider costs? And tell us what costs you think we need to consider. But it then introduced whole assumptions and about things that it was going to consider costs, conceptualizations of what is the cost and what is the benefit that were never disclosed. I think the federal- Again, I have six different ones, but I'll start with the federal one. In the notice of proposed rulemaking and the economic assessment, where they talk about how there's a lot of uncertainty and they say, tell us something about costs. They highlighted the Department of Defense's estimates for federal costs and cleanups and said, hey, look at this. Here's something that might be relevant in the cost analysis, although they said were precluded from considering costs. And then they turned around in the final rule and said, we're not going to consider federal costs at all. We're going to completely ignore what happens at federal sites. And we're only going to look at things that happen at non-federal sites. That is a, call it a methodology or call it an assumption or call it a conceptualization, but it is an underlying principle. Yes, I get that. And you have some precedent on your side. No question about it. Owners and operators is a good case for you. I'm struggling. I mean, if we apply this doctrine broadly as you're asking us to, I mean, we'll really get a big Vermont Yankee problem. And there's a big problem that we're effectively requiring formal rulemaking as opposed to informal rulemaking. You have to put everything into the record. That's formal rule into a record. That's formal rulemaking. A couple of answers to that, Your Honor. I mean, I think there's a question that you raised as to how the doctrine intersects with Vermont Yankee. And I think that Kavanaugh, of course, when he was on- Professor Scalia and Judge Kavanaugh thought it can't be reconciled. Had a problem with that. But you have to try to reconcile, but that counsels in favor of not being too extravagant in how we apply it. I think it may counsel in favor of not expanding it, but I don't think we're asking for an expansion here. And I think if you, again, if you look at, and as you point out, I think there is a fair amount of precedent that really we fall within the heartland of it. Windows covering, American Public Gas, owner-operator, Chamber of Commerce, all of these cases we're talking about cost-benefit analyses, and there was some notice and comment requests. But what was missing was either studies or methodologies. In one case, it says they didn't disclose the way in which they were going to apply this analysis. And here, and I mentioned the federal ones, but there's other, another one is this concept. Yes, Your Honor. I'm sorry. I just have a quick question. Every of those cases, they involved a lack of notice on information that ended up changing in part or in whole the outcome of the rule. They were sort of had outcome impacts, the information that was left out. Do you have one where there, what was not disclosed in the NPRM did not affect the outcome in parts or in whole? Maybe I think, maybe I would, my answer to you would be to quarrel with the premise because I think that these cases, there is a distinction between supplemental information and critical information, but in a case like owner-operator, I don't think it changed what was, in the final rule, it did not change the ultimate bottom line that had been proposed. A relevant, a significant relevant portion of it. I mean, it had, what was added in had discernible impact. Something shifted from the NPRM to the final rule in something regulatory, shifted in regulatory, something of regulatory consequence. I don't, I guess, I don't, that's a hard read those cases. I think, for example, the Chamber of Commerce case, this court had reversed the previous rule for a mistake, what it found to be an error in the cost benefit analysis. And that was.  Correct, it was, well, it was, it was a material error and then it was corrected. So I guess that you are. What's the material about it, Max? If you're. Well, I think it supported the cost benefit analysis, the ultimate conclusion in that case. This court said that there was a mistake there. But you have, I guess, maybe I'm not being clear, but you have here is them in the NPRM and their economic assessment, first of all, dealing directly with direct effects. They did that again in the final rule and you're not challenging it, the notice requirements, okay? And then a lot of what's going on here is about indirect effects. And in the indirect effects, they did their own sort of qualitative, but not quantitative assessment, evaluation analysis and the economic assessment and talked about the uncertainties, acknowledged the uncertainties, grappled with them and said, here's where it comes out for us. And you come to the final rule here, they do the same qualitative analysis. And when they get the quantitative done, there's nothing of what I see you guys being concerned about changed anything. These are all one indirect effects and changes. And in particular, this continued acknowledgement and not dispute by you of the massive amounts of uncertainty that you're even trying to predict here. And so that's, I think that's why those are the cases. I think I understand the question. If I could answer, I think there's three different potential answers to that. The first is, even at a very, very high level, a 30,000 foot level, I think there was a fundamental change to the cost benefit analysis because in the notice and the economic assessment, there wasn't a conclusion about whether costs outweighed benefits or benefits outweighed costs. They said in the- Qualitative one, but not quantitative. Not even on the qualitative, I don't think they reached a conclusion as to what one outweighed the other. He said advantages outweigh disadvantages. And then the second point is that on the qualitative stuff, your honor, there are different qualitative points that were raised here. If you compare, even in the economic assessment, they do talk about a few qualitative things, but they're limited and actually went through and tried to kind of sort out what they were. And I think you can- Honor, I'm afraid I changed what the number of safe driving hours was. And I'll get into the quantitative in a minute. But on the qualitative point, this is at JA 144 to 146, there's three pages of the economic assessment. And they mentioned four things, more efficient cleanup, earlier response activity, potentially increased research and development and health benefits. Those are the four qualitative advantages and disadvantages. They say they can't quantify at the economic assessment stage. That's it. They also talk about a fifth thing, which is the transfer of cleanup costs from quote, public to polluters. I will give them those five things. More efficient cleanup, earlier response activity, increased R&D, health benefits, and the transfer from public to polluters. But there are other qualities, what they introduced within the final rule is other qualitative conclusions. One of them, whether you wanna call this qualitative or quantitative is the exclusion of federal sites. But another qualitative conclusion is that they are going to treat all costs, new costs at non-superfund sites as benefits. Another qualitative. Is that quantitative? I mean, Mr. Lin, I guess my question is, do your notice and comment violation claims depend on the threshold question of whether costs have to be considered under 102? Because EPA is putting forth both qualitative and qualitative justifications. So if, for instance, their qualitative assessment was sufficient to support the designation, then would there be a notice and comment violation? I mean, your notice and comment violation, you know, critical materials, arguments are all based on the fact that they have to consider economic costs and then they didn't provide the RIA and the relevant information for parties to comment on. So if the qualitative is sufficient, then is there no notice and comment violation? I mean, don't you have to win on the threshold question too that costs have to be considered? So I think you're asking two different questions, but yes, costs have to be considered. I think it's a separate question whether, what do you do with the qualitative versus quantitative? But yes, costs have to be considered. Is it separate? Because if costs don't have to be considered, then you have to make an additional argument about why the qualitative, qualitative considerations that NPA put forth don't meet notice and comments. And you don't, I don't hear you making that argument. I think that it's premised on the idea that costs are only quantitative. I mean, when I say cost-benefit, I'm happy to adopt their terminology of advantages versus disadvantages. I don't think that cost-benefit is necessarily a quantitative analysis. I mean, I think what Michigan requires is that you look at advantages and disadvantages and costs are included in that. And that's part of the overall weighing. So that's why I think they're two different questions. I think the one question is, does the statute require them to do this sort of advantage versus disadvantage weighing what goes into that? And then the second question is, did they provide sufficient notice of what they ultimately relied on? But your notice arguments are largely based on failure to provide economic analysis, like actual costs, not just advantages and disadvantages, right, that they didn't provide the RIA, that they didn't give any of this economic information. And I think the answer to that, Your Honor, is that, I mean, I think what you do with the critical materials doctrine is you have to ask what EPA itself considered to be critical, which I think gets kind of all back to the third answer to Judge Millett's question about qualitative versus quantitative and did it make a difference? The government has argued in their brief that all of this quantitative stuff was just frills on it, right? It was just extra, it was illustrative, they didn't rely on it. But with respect to my friend, I think that's, if you look at the preamble, I think that's a post hoc litigation position of counsel. If you read, just starting at JA-26, when EPA talks about the totality of the circumstances test that they have newly created in the final rule, they say, EPA weighed the quantitative and qualitative costs and benefits valued in the RIA. EPA considered the estimated direct and indirect monetized costs. EPA also considered qualitative costs. And there are, over and over, it talks about how it took into account the quantitative estimates of costs and as a point of comparison, so they cite some stuff about, well, they say, well, we specifically said in the rule that we would reach the same conclusion without the quantification. The only place that that appears is with respect to the consideration of quantified benefits. And that's at JA-32. EPA believes that the advantages of this action outweigh the disadvantages, even without consideration of quantified benefits. It never says that about quantified costs. It only, and I think that comparison is important. You have to take the agency at its own word. It specifically says, and as it is allowed to do, we've done this analysis, we've tried to quantify the benefits and the costs. We think the benefits are sort of really hard to pin down. So even without it, we think the advantages outweigh the disadvantages. They never say that for the quantification of costs. Instead, what they say is that, they say things like future response costs are difficult to quantify. Unlike with benefits though, EPA concluded that it has sufficient information to reasonably estimate anticipated future costs for NPL and non-NPL sites. So I think what this all kind of comes back to is, while the government has suggested that the quantitative costs here are just icing on the cake, what it really is when you read the preamble is it was butter, it was sugar, it was a critical ingredient to the totality of the circumstances. Can I follow up on Judge Rouse's question? So suppose I agree with you that Michigan versus EPA does require consideration of cost, but I don't think either the statute or Michigan versus EPA requires a quantification cost. You with me on that? I'm with you. Okay, so as a conceptual matter, we'll get back to how EPA treated the two documents, but they could have done a qualitative assessment in the preamble for purposes of judicial review under the APA, and they could have done hundreds of pages of quantification in the RIA for purposes of an executive order that's not judicially enforceable. And our review would be just on the qualitative in that scenario, right? With a caveat, but yes, I take it you're going from there. So quantification as a substantive matter is icing on the cake. They don't need to do any of it in order to have a non-arbitrary explanation consistent with Michigan versus EPA. So I think the issue here, there's, I'm trying to sort this out, because I think the way to answer that question is this. Michigan leaves it to the agencies to, I think it says to how best to account for costs. I think we think as a, I would quarrel with the premise of your question, which is I think in order to do a reasonable advantages versus disadvantages assessment here, you have to take into account some of the quantification because these cleanup costs are massive. But accepting your hypothetical, I don't think it matters for purposes of a notice and comment question here, because what the critical materials doctrine, the critical information doctrine is asking is, did EPA give notice of what was critical to its analysis and its conclusion, which is why with your indulgence, I was reading to you those parts of the preamble. I think what's really important here is when EPA concluded in the totality of the circumstances test in the final rule that the advantages outweigh the disadvantages, what motivated and underlay that ultimate decision? Because if the quantification there was important, and we think it's clear from the final rule that it was. You do have these cross-references in the preamble to the RIA, which tends to support the argument you're making, which is we have to judge their explanation on its own terms. But boy, if we conclude that the qualitative analysis in the preamble would suffice for EPA purposes, and like, it's really not that complicated. This is really dangerous stuff. The statute is focused on, the designation part of the statute is focused on whether the chemical is hazardous to human health. And all of the downstream stuff about who pays what, like CERCLA has guardrails. So we'll worry about that later. Like that's their basic rationale. And I mean, by EPA standards, it hangs together pretty well. So we're gonna set this thing aside because of some fantastical possibility that buried deep in the RIA are some numbers that might change when they redo the calculations that they never had to do in the first place. Well, Your Honor, again, I would fundamentally disagree with your reading of the preamble. I think if it were indeed, if all of these quantitative, these numbers were fantastical icing on the cake, we will be dealing with a very, very different case. But they talk at length in the preamble about the shift in costs, the $50 million per year, the $18 million per year of costs at these sites that are going to be a meaningful advantage and a benefit of the rule. I mean, if I could, at JA-41, this is one that really, this is in the preamble. JA-41, this is in the context of discussing enforcement at non-superfund sites. So this is all cleanup that nobody believes would exist, but for designation, because this kind of enforcement against private parties can only happen if you have a designated hazardous substance. Quote, EPA acknowledges that costs, parties' expense to clean up PFOA and PFOS is a burden on them. But notwithstanding this, EPA views the cleanup monies, sorry, I have a typo, it says movies, the EPA views the cleanup monies spent by PRPs as an advantage of the rule. And if you look at that right there, they're talking about $18 million a year of cleanup costs that would not exist. But so there's a bunch of costs that they say would exist even in the non-designation baseline. But these $18 million a year are costs that everybody agrees would not exist without designation, and they are treating these as benefits. And they say that these are an advantage of the rule. And these are the costs that they say they had sufficient information to reasonably estimate that they took into account as compared to the quantification of benefits, which they specifically say we'd reach the same conclusion even without them, as compared to litigation costs, where they say there's not enough information for us to write to quantify that, so we're not going to. Okay, I'll accept that for purposes of this argument, they made a decision that they didn't want to quantify that. But I don't think there is any fair way to read this preamble in the way that the government has attempted to characterize it in their briefs, which is that- The legal private enforcements that you're concerned about, they do have to be conducted consistent with the National Contingency Plan, is that right? Yes, Your Honor. And the National Contingency Plan requires at least when implemented by EPA, specific, site-specific balancing of costs, cost-effectiveness consideration, then you don't have all of those remote contingencies, then it's not much more concrete and you have to do a cost balancing and a cost-effectiveness analysis, right? At that point, yes, Your Honor. And so to be consistent with that, the private entities have to undertake that same, again, now it's more focused, cost-effectiveness and costs, pro-competitive advantage, disadvantage, I forget what we're calling it now, balancing, before it can happen. Yeah, yes, I think- So you can understand how EPA up front is saying, we can't predict with much certainty at all, other than maybe reference historical practice, but which states, which private entities are going to take up these cleanups on their own and then try to obtain compensation, where, when, who, how much, and even if they wanna do that, they're going to have to show that in undertaking that cleanup and incurring these costs. It was consistent, they did this, and appropriate, or at least consistent with, I don't have to be identical, I'm not sure how consistent it has to be, but I don't know what that word consistent means, but it's gonna have to consider costs and cost-effectiveness at that point. And so why was it wrong for EPA to say, we think, you want numbers, all right, we think based past practice, maybe this is what's going to result, but who and when and where, and whether any of it will actually shake out, because a lot of this stuff is already getting cleaned up anyhow as part of other cleanups. It just, it seems to me you're wanting a lot more, picking out those numbers, you're not sort of grappling with all the layers of uncertainty and all the layers of protection that actually even still exists for these private and state actions that are going to let you have that very careful analysis that you say you need to have, has to happen. You don't say this can't happen and this can't be listed. You simply say, we need to get this beforehand, and you're gonna get it beforehand, or you'll have an argument, if someone doesn't give it to you, then you'll have a good way to challenge it. Yeah, I think there's a couple different arguments in there. I think we do take issue with the claims of uncertainty and that there are some things that they say can't be quantified and they don't quantify, but I don't think you have to reach that to address the notice and comment issue, which goes to the quantifications in part that they actually did, right? So Your Honor, some of these questions that you're raising about, they say that they can't calculate- It's prejudicial if in fact they're wrong that the totality of the circumstances analysis, I'm sorry, that their decision that we don't need to do this and or our qualitative analysis was sufficient. On notice- Prejudice by any of these numbers. On notice and comment, the question of prejudice this court has said is not a high bar. The question is, did we have anything useful to say- They have to win on the argument that they had to do a quantified, a dollars cost benefit analysis, because if the statutory answer is, they give us sort of three options on the table, we don't have to do it at all at this hazard designation stage. The cost benefit analysis is what's gonna come later, much more site-specific in focus. That's one. Two, to the extent we have to do a qualitative, beyond the direct effects, and for the indirect effects, qualitative is permitted and we've done that. Or three, it has to be number crunching. You have to prevail on it has to be three, it has to be number crunching for us to say, well, when they predicted a range of expenses for privates and state actions, they had to get that better? I don't think so. I think the way I would suggest you think about the analysis is this. One, do they have to do an advantages and disadvantages weighing at all? I think the next question is, what did they do? But the first question is, did they have to do an advantages or disadvantages weighing at all? And I think the answer to that- Number one, so you have to win on that? Yes, and I think the answer to that is yes for a number of different reasons. I understand your argument, I'm just saying you have to win on that before you're even prejudiced by any of this. Yeah, and so then we'll move on to that, because the first is that, and I think the answer to that is yes for a number of reasons, one of which is the government has conceded for purposes of this case that they had to consider costs. In the preamble, they said kind of both things, but they've come into court, page 39 of their brief, and said- Quantitative or quantitative? Quantitative, they have to do some sort of weighing. Appropriate means you've got to look at the relevant factors and weigh advantages versus disadvantages. I think the answer to that is yes, whether it's on a party presentation ground, or if you look at Michigan directly, I think Michigan, the way the statute's set up applies to that. We can talk about that, but that's question one. I think as to two and three, Judge Millett, and this gets back to my dialogue with Judge Katsas, I think they sort of collapse into, and what did EPA think was critical to its analysis, right? Because if EPA says, we had to do an advantages to disadvantages, the next question for purposes of notice and comment is, what did they do and what was critical to their conclusion? And that is the sort of colloquy that we had, which is, I think the preamble makes very clear that the numbers that they did crunch, at least with respect to costs, they absolutely relied on them because some of those costs, 18 million and 51 million, they considered benefits. And I think that is the question. I don't think we have to weigh in on, do they have to consider quantitative because they did. I don't think they said we considered a particular dollar amount, the benefits. I think they said, we, as the statute of the design, consider the transfer of these costs, which is gonna happen at some point. It's to some degree to be a benefit because the statute considers that a benefit. Well, right. I don't read their decision that if it's not 18 million, then we would decide this. Then we're going home. We're not regulating this. So one, I think they do, but two. You think they say that if the benefits are not this dollar amount, the dollar amounts we've identified or that range, then we would not regulate this by statute. I'm sorry. There is no sentence that says that specific thing. I don't even think that's. I think it's part of it because they call the totality of the circumstances test. They don't identify which 10 things are on this side of the ledger and how you weigh them against the other 10 things. What they do have at, and again, I'm sorry. I've lost it now. JA, I think it was 387. They have a table in the RIA that they refer to the cross-reference from the final rule that has the 29 different impact categories that are the costs and benefits that were taken into account in the totality of the circumstances. And they don't tell us exactly how you weigh one thing or the other. They do at one point say the quantification of the benefits that we can sort of take or leave. So Mr. O'Malley, I have another question. Is your notice and comment argument contingent on the fact that the reasoning is arbitrary and capricious? I think it's contingent. Because many of these arguments that you're making now are not about critical materials and notice per se, but just that internally the rule is unreasonable or poorly reasoned or you can't sort of trace the reasoning. I think it's, no, I think it's both because I think we have to- And are they separate or are they connected? They are connected in part. So the notice and comment analysis, we have to identify some things of which we were not given notice that were critical. And then we have to establish prejudice. I think the arbitrary and capricious, the prejudice argument knocks up against the argument that the reasoning is arbitrary and capricious. But under this court's cases, we don't have to actually win the arbitrary and capricious argument on those things of which we weren't given notice, right? We just have to show that we had something useful to say that would create some uncertainty as to the outcome. But the court has said, we don't have to show that it would have convinced the agency to go the other way on those pieces of it. But one other thing I did want to stress is- Sorry, at some level, it cannot be that when you have, you know, you pointed out how long and comprehensive and multi-factor this weighing of advantages and disadvantages was both qualitative and quantitative. And all you got to do is find one number and say, oh, we would have told you a different number. And then we always send it back. It's a never-ending cycle. Not always, but the problem here is with the way EPA did its analysis. You can just, it's hypothetical. If they had actually done, and I'm saying that they had to do this, right? But if we had a different case where they said, there are $100,000 worth of benefits over here, and there are $50,000 worth of costs over here, and then there's some other quantitative benefits that go above and beyond that. And if we found a problem with the, you would know better which pieces of those, how they fit together in the analysis. But EPA here has chosen to do what they call the totality of the circumstances test. So they don't, they haven't built the agenda tower for us to understand what each individual piece does. And I think what we've identified are- It's a burden to show prejudice. Yes. And agencies do totality of circumstances analysis, not uncommonly, and they're allowed to do that. Michigan versus EPA calls for that. And so I don't understand what that means. If you say, they have to give you sort of some sort of analytical framework, sort of a program here that says, and by the way, if this one changes, oh, that's bad. If this one changes, it doesn't matter so much. I mean, really, I think the burden's on you, and I'm having trouble understanding, especially when you're mixing qualitative and quantitative in the balancing, how simply your objections, which seem to be really very data specific, this number versus that number, well, we would have told you this number versus that number, not go to analysis, not what they've done, which you didn't consider this, or you failed to add that one in. You have to show that it was gonna make a difference. Don't you? You're not big enough to make a difference. No, I don't. Not in this, as a general matter, the prejudice standard does not require us to show that we would have convinced the agency to come out in a different way. All it requires is for us to show that we have something useful to say. I mean, we're going in circles here. It has to be, because I thought you agreed, it cannot be, wait, we had 50 cents more to add, right? You could have added that. I think you would say that's not useful and that it's not gonna be material to an analysis. And so don't you have to show, it's not just that we have a different number. Courts are rarely ever gonna say which of the two numbers for an agency in a technical area like this is right. So it has to be more than just, we had a number. We had a number that could, you don't have to show would for a notice, but that could have changed this. And I think we have done that for two reasons. One is that these aren't just numeric complaints. And your honor, I think I was unable to circle back around to your question about the number. I think I mentioned before about the 18 million and the 18 million were different where they have taken the ball and gone home, right? The complaint about the 18 million, and this gets to Judge Riles' question before about is it quantitative or qualitative? I think there is a qualitative element to our complaint about that. And then there's another thing, which I haven't mentioned yet but on the 18 million, it's how they're treating that 18 million. Whatever magnitude that number ends up being, the point is that they have decided, the EPA has decided that 18 million of new costs will be treated solely as benefits. That is a big conceptual swing, no matter what that number is. Things that should be in the cost column. Why? Why can't they just make a first cut global assessment that these chemicals are dangerous enough that like they should be cleaned up? And then all of the particulars about, what if it's just one part per trillion and it's not worth doing, just gets handled post-designation. So, Your Honor, I think you're, just to make sure I understand, you're asking sort of the threshold question about- They can just make a general assessment. The only question before us is could they permissibly designate these chemicals as hazardous? And they look at the science and you haven't contested any of this. They conclude these chemicals are really dangerous. Cause birth defects and cancer and everything else. And the conclusion is as a general matter, right? Arbitrary and capricious. We're not fly specking too much. They say it should be cleaned up. And that's true regardless of whether it's, whether the site is on the national priorities list or who's gonna do the initial cleanup, who's gonna get hit as a potentially responsible party. It just seems like that's a categorically rational decision on the threshold question, whether to designate or not. And then you have all these details on the backend about which sites do you do first and how much do you have to clean up and do you not bother if the concentration is really, really small? A couple of answers to that. I mean, again, I think the first answer to that, Your Honor, is that's not what they did. They have said, they did. I'm suggesting that might be what they're doing when they say this is really a benefit. This is a net benefit. Cleaning the stuff up in non-NPL sites is a benefit. But it's part of the way that they weighed advantages and disadvantages. And it's a totally new method or assumption about how you think about whether those costs are advantages or disadvantages that they didn't give us notice of. And we could have had this very debate with the agency if they had actually provided notice and comment. I think that's really, I mean, that's ultimately the notice and comment complaint is that there are whole pieces of how they thought about the advantages and disadvantages. Some of them are numbers, others of them are not. Another example. Mr. Leung, would you have the same argument if the preamble said perhaps more clearly something like what Judge Katz has said, that we are making a qualitative judgment that these are hazardous substances that need to be regulated. And we have an economic justification separately. Would you have the same argument? I think it would be a different case. It would be a different case. Based on the notice and comment, although we would, I think on the qualitative judgment, we'd have to see what went into their qualitative judgment. If it was Judge Katz's is like kind of a one-liner about, well, we've sort of generally weighed the qualitative. Well, that was partly why I asked the question towards the beginning of this argument, which is, do you have to prevail on the threshold question about whether costs are part of 102? Because if it's sufficient to simply do a kind of, qualitative assessment about what's a hazardous substance, then can you still prevail on your arguments? I think we can, because on the notice and comment- Because of what they did, but not necessarily because of the law. Well, but those two things go together, right? Because- Sorry, finish. I'm sorry. Go ahead. No, go ahead. Because if the law requires that they do an advantages and a disadvantages assessment, which again was sort of step one into the analysis, and they do it, and they reach that conclusion based on a number of, whether it's data, or methodologies, or assessments, that they don't give us any notice of, and any opportunity to comment on, and that that is the basis for their advantage and disadvantage assessments, then there is a notice and comment violation. And the question is whether that was prejudicial, right? That's the next question. 102 is just a purely precautionary provision. An EPA can decide that something is a hazardous substance because it affects the environment or human health. Then do you have a winning argument? If they don't have to do the advantages, the disadvantages. Well, advantages and disadvantages, that's so broad, but- If they don't have to do anything other than consider whether the substance is hazardous. Yes. Then the notice and comment argument does fall away because that is premised on the idea that the word appropriate in the statute requires them to do an assessment of- Some kind of assessment. Some kind of assessment. Again, as we've talked about, I think the government has conceded for purposes of this case that Michigan does require them to do that. Conceded, they just assumed without deciding, but they went anyhow. That's different than a concession. I think what they have, maybe the way that I would put the concession is, is they have said to this court that it should be assumed in this case. Yes, EPA assumed without conceding at the final rule stage of Section 9602. And therefore, the only live issue in this case is whether the cost- I'm just clarifying. Yes. That's important. I think as if you read on in that paragraph, it says that, and therefore the only live issue here is whether the cost benefit analysis or the advantages and disadvantages weighing was done correctly. And so I think they're asking this court to assume that they were required to do that. And the question is whether they did it correctly. And whether they did it correctly, one question is whether it's arbitrary and capricious, but a threshold question is whether they provided sufficient notice and comment. Some of them are numbers and some of them are- I provided this $18 million number from the NPRM thinking you said, this is what we think this advantage is. Where have you shown what you would have done differently other than substance of debate, whether it's the statute allows them to consider that an advantage? We, what we've said about, oh, I'm sorry, I missed the last part of your question. Sorry, if I could give you a clue, so we didn't have a note. One of the ways we think about prejudice is, well, if you usually would say, well, had they told me this, then we would have done, had they told me X, we would have done Y. There are two objections that we have to the $18 million number. Omission from the NPRM. One of them is that they considered that $18 million, again, could have been bigger, could have been smaller, that they considered it as a benefit and not as a cost. It's more a legal argument than a notice argument, isn't it? I think it's, that's a, it's a, it is still a notice argument because it deals with how they ended up. This gets to the quantitative versus qualitative. I think it's qualitative in the sense that they decided they're going to consider that whole category of stuff. We've made all these arguments, right? We did not make that argument in the comments because they didn't preview that they were going to take these new costs and treat them conceptually as benefits. And the other thing, if, so that's one objection. That's a qualitative objection. As to the actual $18 million number, that only counts federal enforcement. And they say that they're not going to calculate in that 18 million what happens with private and state enforcement at those non-superfund sites. And one of the things we point out in our brief is that historical data shows that only a third of enforcement at those sites is by the federal government. And so, again, if we had had an opportunity to comment on it we would have explained that that is a woeful undercounting of the costs that will occur at these new sites because two thirds of enforcement occur by somebody other than the federal government. So I think we did have, not to overuse the phrase, but useful comments about- They would just up the benefit value. Maybe, who knows? And who knows how they would have done it? But that's the whole point of the notice and comment process. And the other qualitative problem that we have, which I haven't gotten to, is they count these operational changes to sort of cut down on the potential releases of this chemical as a benefit. It's included in the chart at 387 and 389 as a benefit, but then in the totality of the circumstances analysis, they tell us that they're not going to consider the costs of those actual changes. Again, I don't know if you want to call that quantitative or qualitative. There are no numbers attached to that. So let's call it qualitative. It's a qualitative conclusion to count only the benefit of operational changes to cut down on releases of PFOA and PFOS. But then they refuse to count what the changes would actually cost. I thought what they said was complicated because it's no longer being manufactured in this country. Correct? These two substances are no longer being manufactured. So you don't have those types of costs. And so then you simply have questions that come in, I guess, through imported products. So you have that complexity of them trying to predict. So it's not going to be the sort of linear analysis of you counted it here, you didn't count there at all. I think they explained why they were doing what they were doing. And it also gets more complicated in this case because there are other statutes that keep kicking in and covering a lot of this stuff, whether it's hazardous waste or other issues. There's a whole network of statutes that are covering and some of these costs are already getting covered under these other programs anyhow. And then the PFOA and PFOS are often only getting cleaned up when, and this could be, I don't know why this would be any different for private and state enforcement rather than federal. It's a site, since they're already cleaning up the sites, this is getting cleaned up as a part of that. There's not, so far as they said, they don't think that there's huge amounts. So they're unclear how much of it's going to be a pure PFOA or PFOS cleanup. So it's on top of things that are already getting cleaned up so you have to be able to figure out how to back all of that out. And so it's, I think they've dealt with the uncertainties and the complexities and the, not only is it not linear, then this thing is, you know, an absolute jigsaw puzzle in trying to sort of embrace things. They weren't just, they weren't playing the game that I think your analysis was suggesting. We're going to only count the good and not the bad. But explain, they explained it and I don't know what more we asked of them in this context. Your Honor, what they say is that, here it is, JA387, that they count under deferred benefits the requirement to report releases may lead to improved handling, storage, transportation, and waste management and treatment practices. And then they say in their brief, that the costs of those practices are not fairly attributable to the rule. That is- Waste management's already regulated. But why would you count those changes as a benefit when you don't count the costs of making those changes? That is what Business Roundtable- If there's any cost, it's a benefit, but a lot of it's already getting captured. I mean, you're the ones who have to show there's something material. Your Honor, with respect, I don't think that's what the agency said. I don't think- And it could have, it's not what it has. I think that they say that these, they count these as deferred benefits, which is why this table is so helpful. And then they say that the cost side of that, in their brief, at 62 to 64, is not fairly attributable to the rule. That is an internal inconsistency in how you treat costs and benefits under Business Roundtable. I did have the statutory argument if this Court is interested in discussing it. I just have a quick question about your non-delegation argument. So my reading of your brief is fixed. You were not challenging Section 102 as being an unconstitutional delegation. Correct, Your Honor. Okay, but then I'm not sure what your argument is. I'm not sure exactly what you're asking this Court to do then, because, I mean, Justice Scalia is very clear in Whitman that agencies can't cure an unconstitutional delegation with a different interpretation. And you seem to be suggesting that the interpretation EPA has adopted raises constitutional concerns, which suggests that they could adopt a different interpretation that would address those concerns. I'm not exactly sure what you, what even ideally you would like from this Court with your non-delegation argument. Your Honor, I think you're pretty close to it. So I think our argument is the statute is being read in a way that is, allows them standardless and limitless discretion to designate substances, and that runs up against a non-delegation doctrine. But the question is, is the statute, does the statute lead to standardless, you know, no intelligible principle decision-making? And you're not arguing that the statute lacks an intelligible principle or violates the non-delegation principle. So the next step to the answer is, so our argument is that their interpretation of the statute is incorrect. And what we are asking this Court to say is that their interpretation of the statute as allowing for a possibility, and not a certainty of substantial danger is so broad that it runs afoul of the non-delegation doctrine that it's inconsistent with the statutory hierarchy, and that you should, they get the rule and send it, you know, and give them another chance if they would like, as they have indicated that they would in this press release that is cited in the briefs. To interpret the statute correctly, and in a way- You just say this interpretation is bad. Is incorrect. Is incorrect, but what would we say the correct interpretation is? I don't see that in your briefs. I don't think this Court has to, in terms- It's a little, I mean, if we under Loper-Bright have to say what the law is, we just say, well, it's not what the EPA says, but that's it. I think that that's right, Your Honor. I don't, with respect, I don't think Loper-Bright tells you that you have to, in every case that raises the statutory question to interpret the statute. I think what it says is the Court exercises independent judgment, and it doesn't defer to the parties or the agency. And so the question is, did they get it right? I think that usually when you say that the agency has gotten it wrong, courts have some account of what the right interpretation is. We have suggested- I don't see what that would be from the petitioners. We have suggested in our reply brief that may should not be read as possible, but something more like able to. We have, when we talk about, when you have may in the contingent clause with when released into the environments, blah, blah, blah. So there are other interpretations of the statute. We haven't asked this court to adopt that interpretation.  that wouldn't cover these chemical substances? It's hard to say whether the science would actually satisfy the interpretation that we've set forth. If you have an interpretation that you believe it would be unlawful for them to say this means. Do you think you're able to? Wouldn't be met, isn't met even on this record? I think a few answers. One, I think this court can actually uphold the rule on that ground because it would be a different statutory interpretation. But to answer your question directly, I can't say based on the science, whether EPA would ultimately be able to reach that conclusion. Show that this is able to what the findings show in Georgia, I was gonna point this out earlier. You had suggested that they said that it causes all of these things. I think if you look at what the findings say, it says that there's associated with certain health effects, right? And look, we acknowledge that under a correct reading of the statute, which I think would be more restrained than possible, there is still some discretion for the agency in figuring out whether the science meets that standard. And we just can't know how that's going to play out in practice until the agency operationalizes a correct and new reading of the statute. Thank you very much, counsel, for giving some time for both. Thank you. Thank you. Good morning, your honors. Riley Walters for EPA and Administrator Zeldin. I'll start here in the talk with the notice and comment argument. Interested parties were on notice that EPA may consider costs in the final rule. EPA solicited a comment on the cost question. This was not just a bare request for comment, as my friend suggested. EPA solicited a comment on every aspect of the question. This is a JA-78. Well, what does it mean to solicit comments on costs where the agency has top-line position is costs don't matter? Well, yeah. Yeah, please go ahead and give us some comments on costs. Like, how can those comments possibly address what the agency is considering when they've said that costs don't matter? So, your honor- Because that's what it said in the proposal. To your response, your honor, so EPA did provide an economic assessment that provided the basic framework for how it was thinking about the cost issue. In the actual solicitation for comment itself, EPA said, do we have the statutory authority to consider costs, or are we required to consider costs in the statute? If so, what costs and what benefits should we consider? How should we weigh those costs and benefits, and how do those costs and benefits factor into the ultimate designation decision? Then EPA provides the economic assessment that lays out the general framework. Well, that's more like a request for information than comments on what the agency is, in fact, doing, or the justifications that they have for their proposed rule. The justification is, we don't really need to think about costs. Here are some top-line considerations of advantages and disadvantages. Please give us information about costs and benefits. Your honor, I think- I know those things just don't match up. Your honor, I think the agency did a little bit more than that in the economic assessment. So, for example, in the economic assessment, EPA went through the general categories, direct costs, those were the reporting costs. EPA provided a quantified figure there. EPA looked at direct benefits, such as better information on the scope of contamination and faster cleanups. That was noted as a benefit. They also looked at costs. How does all that match up with the 300-page RIA? Your honor, I think the 300-page RIA is the logical algorithm of that, because, again, EPA was relying on the same general categories and simply expanded on that framework. And I think the best evidence that petitioners had a meaningful opportunity to comment on the cost question is the fact that they did comment on it. The chamber submitted a 20-page cost report with quantified numbers, and EPA considered that information along with information supplied by other interested parties, and they explained why it disagreed. And so the notion that petitioners were surprised by the cost analysis in the RIA, I think, is hard to square with the record in giving their own comments. Well, so they commented, but they didn't have notice, really, of what EPA was going to, of at least any kind of detailed information. I mean, the fact that the chamber could pull together comments about costs that they thought the agency might consider to be relevant, it's not, I mean, it shouldn't be on regulated entities to guess what kinds of costs and benefits an agency is going to take into account. Your honor, I don't think, and there's record supports that they were guessing. Again, in the economic assessment, EPA provided extensive information of the types of costs and benefits it was considering, and most of these were qualitative. Almost all of them were qualitative, and these are the same qualitative costs and benefits that were considered in the RIA, and this went out for comment. Petitioners had an opportunity to address, for example, if EPA was thinking about this wrong, if EPA needed to provide a more robust quantitative analysis, if a qualitative analysis would have been insufficient, they had the opportunity to do that, and I think, under this course, logical outgrowth cases, that's more than sufficient. How do you reconcile your position with cases we have, like owner-operator, which seems to treat methodology as its own category, and something that must be disclosed, to some degree, must be disclosed at the outset, and does it on an incredibly hard-look basis, like one aspect of the cost-benefit calculation, one aspect of that methodology didn't get disclosed, and we reversed on that basis? Yes, your honor, I think owner-operator is a critical materials doctrine case. What the report said there was that the particular methodology that did not go out for comment. Critical materials, which sort of suggests like the hiding a secret study point, but in fact was about an undisclosed methodology. Right, it was about a methodology. Totally, we agree, your honor, and what the court said in owner-operator was that methodology was an integral part of the model that itself was the central justification for the role, and so the court said that the public lacked the opportunity to comment on the most critical factual material in the case. We don't have anything like that here. Here, the general framework for how EPA was thinking about the costs did go out, and the economic assessment. My friend on the other side seems to focus most on here are the quantified illustrative estimates, and those were not a critical part of the cost analysis, and the cost analysis was not the central justification for the role, so I don't think the owner-operator is anywhere close in this case. I would agree with you if you had written the preamble a little bit differently and said this is the qualitative analysis that we want to stand on for EPA purposes, and we've done this whole other number-crunching thing for the EO, but there are these seeming cross-references in the preamble where you did seem to take on the whole burden of that multiple hundred-page thing. I mean, I don't know why you would do it, but you seem to do it. So, your Honor, I think the question of whether EPA considered those numbers is different from whether they were critical material in the case, so it's true, your Honor, in the preamble, EPA did know that it considered the quantified figures, but it noted throughout the preamble and in the RIA itself that these were merely illustrative. It notes time and again, for example, at JA-26, that the RIA doesn't fully capture the costs and benefits because there's just too much uncertainty at JA-36 and 37. Give me your best shot, best one or two sites in the preamble for the proposition that the agency would have done the same thing without the RIA. So, I direct you to JA-26, your Honor, and again, EPA did not use that exact language, but it, again, goes to, EPA was expressing the fact that there is so much uncertainty associated with these quantified costs and benefits. Where on 26? I have kind of the money quote is maybe a third of the way down on the left-hand column, which says the analysis included consideration of the RIA. So, the far right column, your Honor, on JA-26, last paragraph where it says, first sentence, the RIA does not fully capture the quantitative costs or benefits of the rule due to data limitations. And I want- But, Mr. Walters, I mean, EPA also says that it is assuming that costs and benefits have to be considered. Right. But then it says it's only using the costs and benefits as illustrative. So, how do you have it? Either it seems that EPA should rest on the fact that section 102 allows it to make a purely qualitative or hazard-based determination. That's one justification. But on EPA's own reasoning, it says it's assuming that it needs to do this type of balancing. And then it points to the RIA and other economic justifications. So, then, doesn't that have to be reasonable on EPA's own terms? Yes, Your Honor, it does need to be reasonable. But EPA, again, assumed that it had to consider costs and benefits. It did not assume that it needed to perform a quantitative analysis of costs and benefits. And the only figures that are described as illustrative are those quantified figures. We agree, for purposes of this analysis, EPA did need to consider qualitative costs and benefits. But under Michigan, the court went out of its way to say it was not requiring agencies to assign a monetary value to each cost and benefit, recognize that a qualitative analysis may be appropriate in certain contexts. And we think this is a context where a qualitative analysis provides more information. So, then, does EPA have to prevail on the threshold statutory question that Section 102 does not require consideration of costs? So, Your Honor, we assume, for purposes of this analysis, that we did have to consider costs. Real costs? Not quantitative costs. Again, because we're at the designation stage. This is a preliminary stage in the circular cleanup process where there's just not enough information to provide robust quantitative analysis. And so, we don't think the court needs to decide whether EPA is required to consider costs. However, if the court thought that EPA erred in its cost analysis, and that was the issue in the case, then I think the court would have to decide the question of what statute requires. But we don't think the court has to reach that in this case. Because the qualitative assessment is sufficient. Yes, Your Honor. And the 300-page RIA is just illustrative, so it's not critical material. No, we're not, I'm gonna make it very clear, we are not arguing the 300-page RIA is just illustrative. We're talking about the quantified figures, the four, I think it's four, quantified estimates that EPA acknowledged were being made based on imperfect assumptions and a lot of uncertainty. EPA labeled those estimates as illustrative. The qualitative analysis was not illustrative. That was part of EPA's wing of the advantages and disadvantages in the case. And Your Honor, Judge Katsos, going back to your question, for one more site, I think that may be helpful here, is in the RIA itself, it's JA-592. And here, in the RIA, yes, Your Honor, their EPA said that significant uncertainties prevent a robust quantitative analysis here. And so if the agency was treating these quantified figures as critical to the rule, I don't think the agency would admit that these are not robust figures. That would be an admission to arbitrary and capricious decision-making. One more point on whether these illustrative figures were critical to the rule. Michigan, the EPA said that where appropriate requires consideration of all relevant factors and cost is one of those factors, so agencies can't ignore cost, Michigan implies. But again, they're just one factor, they're one quiver in the appropriate, or they're one arrow in the appropriate quiver. And EPA considered them as such. EPA also considered CERC was purpose and whether designation would further CERC was purpose. Also considered whether there were other authorities that the agency could use to address PFOA and PFOS, and they concluded that CERC was the best authority that was available. And so these illustrative estimates were just one minor aspect of the cost analysis, which itself was just one minor aspect of the totality of circumstances analysis under Michigan. And then all of that was just one aspect of the designation decision, which turned primarily on the scientific finding of substantial danger. And so I just don't think the record supports the claim that these illustrative figures were critical to the rule. It would have been better if we had said that more explicitly, Your Honor, I'll concede that, but I think there's enough in the record to agree with our position on that question. So I think that... I'm inclined to agree with you to the extent that we think of this, the first two of their four or five arbitrary and capricious challenges, which seem to me the strongest are, one is a quantification of a range of 10.3 million to 57.1. And the second is the range of 327,000 at 18.1 million. And if we just put blinders on, look at that chart and say, is there a significant enough likelihood that the bottom line would change if those numbers were adjusted? That seems unlikely. But what if we take a step back on the notice and comment and just look at the whole scheme and nothing was disclosed about the methodology for calculating any of these costs and benefits? I mean, to borrow a phrase, these two problems from their perspective are just illustrative of this global problem that they had no idea how you're gonna go about thinking about this problem and we're making these calculations. I'm sorry, just so I understand the question, is the question, would there be a notice and comment? Yeah, the notice and comment problem is broader than just the specific arbitrary and capricious objections. Understood, your honor. So I think to the extent petitioners are arguing they didn't have a chance to comment on the quantified figures, which I know you're addressing here, or the assumptions behind those figures, for example, the assumption that EPA would bring enforcement actions at 67 non-MPL sites. We think those assumptions are part of the quantified estimates and so that's all the same bucket. My understanding from petitioners' arguments really is only two other buckets of issues that they say they did not have a chance to comment on. One was this allegation that EPA characterized certain costs as benefits, your honor, and I just don't think the record supports that. In fact, the page that my friend cited, JA41, he even quoted language where EPA recognized that these new cleanups that are taking place because of enforcement actions are costs for PRPs. And EPA even said that these cleanup costs were, quote, burden for PRPs, but EPA reached the conclusion that the benefits justify those burdens. And EPA did say that it considers this an advantage of designation that's because it furthers the purpose of CERCLA for polluters to pay for the contamination they cause. Criminal statutes, for example, when they're enforced, they impose costs on criminals. When someone is put behind bars, that's a real cost, but we wouldn't say that there's no advantage to enforcing the criminal law. It also serves other purposes. And it's- It's sort of Orwellian quality about the way that you talk about costs and benefits. So what you're, at some point, talking about real costs and burdens, but then when you wanna flip the switch, you start talking about advantages and disadvantages. I mean- Well, your Honor, I think- I just sort of threw the looking glass quality about the way these costs and benefits are being talked about. Yes, it's a burden on private parties to do cleanup, but we're gonna take that as a benefit of the rule. I mean, I don't know how that's being mischaracterized in the petition. Your Honor, we didn't say that that cost was a benefit of the rule. Again, EPA- You said it's an advantage of the rule. The advantage is- Or something like that. Is that different from being a benefit? So, your Honor, I think EPA's use of the words advantage, disadvantage, in many places, are just interchangeable with costs and benefits. But it also is broader because, again, under Michigan, the appropriate, as maybe appropriate language requires us to consider all relevant factors. One of those things EPA considered here was circlist purpose, making polluters pay. So, when it's using advantage there, it's talking about there is an advantage here in furthering the purpose of- On that reasoning, any time a regulation furthers the purpose of a statute, and let's hope that the government is only regulating when the regulation would further the purpose of a statute, that regulation will always be advantageous. I mean, that's the reasoning of the EPA. So, any time a regulation is doing something that's within the statute and within the purpose of the statute, it's all beneficial. It's all good for society because it's furthering the purposes of the statute. I mean, that has no connection to how we have thought about costs and benefits or advantages and disadvantages. If every regulation that furthers a statutory purpose is advantageous, then there are no limits whatsoever on the EPA's regulatory power. Your Honor, I agree with you. If we had ignored the costs that these enforcement actions impose on PRPs and just set it to benefit because it furthers surplus purpose, that would have been error. But we did not do that here. In fact, the chart, the helpful chart in the RIA, JA387, this is page seven of the RIA, it lists all the costs and benefits. Labeled under indirect costs are costs related to enforcement actions, the $327,000 to $18.1 million. So EPA treated these as a cost and it's cost analysis. So again, Your Honor, I just- Well, you treat it as a cost, but then you wave away the cost by saying it's an advantage. Yeah. So, I mean, isn't that the same thing as just treating it as a benefit? No, Your Honor, because I respectfully, I disagree that EPA just waved away the cost and the language that my friend cited, EPA acknowledged that it was a cost and acknowledged that it was a burden and then it said the benefits justify that burden. And then it also said it was an advantage to further surplus purpose. So I don't think the advantage language was canceling out or erasing the prior language where EPA is acknowledging that it's a cost. It's a complex analysis for sure, but again, I would go back to the criminal statute. You can both acknowledge that enforcing criminal law imposes costs on certain people, and then also acknowledge that there are advantages to enforcing criminal law. They serve the purposes of deterrence, they serve the purposes of incapacitation, and I think EPA was doing something similar here. So was there any situation though, where the advantages of furthering a statutory purpose would not be greater than the cost of something? I mean, it's a sort of generalized reasoning that FERCLA has these purposes, which of course it does. And, you know, these substances, no one is questioning that they are harmful. Okay, but there's still a question of how we weigh the harms of that against the costs that it imposes on private parties. Right, yeah, I totally agree. And the question in these cases is whether the agency engaged in reasoned decision-making. And I think there's a lot of deference that's owed to the agency in weighing costs and benefits in a complex scenario like this. And so I think the question here is, did EPA acknowledge costs? Did it acknowledge benefits and how did it weigh them? And I think EPA did that reasonably here, especially given the stage of the process we're at. And again, just to make it abundantly clear here, so there's no doubt, we agree that EPA could not just relabel costs as benefits and ignore important costs that are imposed on society. Can they rename costs as advantages, statutory advantages to the public? It cannot ignore the cost. If EPA was ignoring costs and just saying, oh, well, it's a good thing, so we're just going to label it an advantage and not even recognize that it's a cost, I think that would be a problem. So it's sufficient to recognize there are costs, but then whatever the costs are, a statutory advantage can overcome that. Your Honor, EPA reached the bottom line conclusion that the advantages of designation outweigh the costs. Well, that doesn't have to be reasonable. It has to be reasonable. So did the agency- Justified and explained. Exactly, Your Honor. So if you decided it would promote surplus to have every single microscopic piece of these substances removed from the United States, and it's going to cost billions of dollars to do that, but that would be consistent with surplus purpose, but then- That would be a situation where designation very well may not be appropriate. And I can think of other examples for if the only available cleanup technology for removing the substance would cause even more danger to public health or the environment, that may also be a reason not to move forward. Or if the only available cleanup technology imposed extraordinary costs on society, if it would cost a trillion dollars to clean up the substance, that might be a reason not to move forward. So there are plenty of examples where I think costs could make a difference here. Here, EPA acknowledged costs, it acknowledged benefits, it engaged in reasoned decision-making, and I think that supports the decision. Thank you very much, Counsel. We'll give you some more time. We won't give you that time, but never mind. Thank you very much, Counsel. I'll give you the intervener. Water first.  May it please the court, I'm John Thomas Katz for the Environmental and Community Interveners. No party disputes the most critical fact in this case. PFOA and PFOS may present substantial danger when they are released to the environment. That is the standard for designating hazardous substances under CERCLA, and petitioners have not provided any basis for overturning the designation of these highly toxic, persistent, and pervasive carcinogens. Today, I'd like to begin with the notice arguments the court has been discussing, and then I'd like to briefly address petitioners' claim that EPA's interpretation of substantial danger lacks limits. So Judge Katchis, you had asked for record support for EPA's position that the cost estimates were not critical to its ultimate decision, in addition to JA-26, which we agree supports that. The first page of the rule, this is JA-002, refers to the RIA as an additional discretionary analysis, and I think that is how it was treated here. All parties agree that notice is only required for materials or peer assumptions that are critical to the agency's ultimate determination. The RIA and its quantitative cost calculations were not critical for three reasons. First, and I'd actually like to put a pin in this one because I don't think the court needs to reach it, there is a justification provided in this rule that does not consider costs at all, and CERCLA does not require EPA to consider costs here, so that is a basis for rejecting the notice argument. However, even if the court were to find that Michigan applied and that some consideration of costs was warranted, the RIA and its quantitative calculations would still not be critical. Michigan is very clear that agencies have broad discretion in how they assess for costs, and here EPA did provide the economic assessment with its proposed rule, which quantified direct costs and qualitatively addressed indirect costs. That satisfied any requirements that may have been imposed by Michigan or by CERCLA, and I think it is particularly important here, given the preliminary stage that this case is reaching this court. This is a decision about whether to add two substances to a list of some 800 hazardous substances. Any decisions about how to remediate the substances, where to remediate the substances, the decisions that really drive the analysis of costs are going to occur much later on a site-specific basis, and that is where Congress required EPA to consider costs, so to the extent that any cost consideration was required, it was satisfied by the economic assessment that was provided. Moreover, if you look at the agency's totality of the circumstances analysis, and this is at pages JA26 to 41 of the Joint Appendix, I think it becomes readily apparent that the specific cost estimates the petitioners are discussing, and even these conceptual kind of approaches that they claim were first announced in the RIA, and we would take issue with some of that, but they were not critical for the agency's decision. That is a 16-page analysis, which on its whole is overwhelmingly qualitative. In fact, I think the only page that references the specific cost estimates that kind of petitioners are talking about is the one that they mentioned at argument. There is one reference to qualitative cost estimates. If you look at that in the context of the totality of the circumstances analysis that the agency conducted, which looks at the harms associated with these chemicals, which looks at the statutory purpose, there's really no reasonable reading of that analysis where the court would conclude that these specific figures were the fulcrum, that these were the critical aspect of the agency's decision. I would- I'll just take you back to JA2 for a second. Certainly. The agency says we made the statutory assessment of substantial danger. Yes. And then it said we did other things that were discretionary. Correct. But it folds into those other things, not just the RIA, but more broadly, the assessment of advantages and disadvantages. Well, Your Honor, our- That seems to tee up the Michigan versus EPA question. So if- Like, I mean, I'll put my cards on the table. I don't think they're required to quantify, but I do think they're required under Michigan, at least qualitatively, to consider costs and benefits. And this passage that you pointed me towards seems to treat all of that as discretionary. To the extent that is Your Honor's position, then we would say they have assessed that with the proposed rule and with the economic assessment. So they- In the RIA or without getting into the RIA? Without getting into the RIA. I think the economic assessment was rational. When you look at, and if you may, I'm going to discuss the remediation process because I think it becomes very clear when you look at this why the sort of precision they were looking for can't be provided at this stage. The remediation process begins with a comprehensive analysis of the contaminants at site. What is driving the remedy? Then EPA at a given site considers the feasibility analysis, which are what are the different options for remediating the contamination and how much do they cost? That can range from monitor natural recovery, which costs very little, to digging everything up and disposing of it in a hazardous waste landfill. And then EPA applies eight different factors from the NCP. I think we're familiar with the process here. My point is that when EPA lists a Superfund site, it has no idea how much the remediation of that site is going to cost. Here we are stages before that and making the decision on a nationwide level. So it was perfectly reasonable for EPA to quantify direct costs and to qualitatively assess indirect costs in this case, Your Honor. Any questions? Thank you very much, counsel. Thank you. And then we'll give you three minutes. Thank you, Your Honor. I think what I'd like to sort of hit is, I think there may be tough critical materials cases, but this really shouldn't be one of them. We're talking about something that started as a 20-page economic assessment that EPA said it was not only not looking at, but couldn't look at, and it's turned into a 300-page RIA. And the agency's position here is that they can throw a 300-page document at the wall and say that there's some uncertainty. And- Our agency is having an NPRM to say, this is what we think the statute requires, but we're interested in your views and then change their mind. Yes, Your Honor. They are. And that gets to the- Is that a notice problem, maybe? Not under the logical outgrowth doctrine, but what we're talking about here is the critical materials analysis. And the agency's position here is that because they did a totality of this- They have to do a whole notice in common and say, oh, that was persuasive. Okay, so now notice and come on this. That's what you want. There should have been another round of notice and comment. On the methodologies behind the quantitative assessments and on some of these qualitative conclusions about treating cost- I assume that EPA was just running into the CRA deadline at the end of the administration. Perhaps, but they did not do enough. I would not be in a position to speculate on that, Your Honor. You see a lot of three-round notice and comments or two double notice and comments like that? There are supplemental notice and comments that are done. Supplemental like this, I'm talking about, this would have been a very comprehensive one like that, where they go, they think this is our view of the statute, but let us know your views otherwise on legal question. Your Honor, I- Come back with an answer to that legal question and information, and then they go, okay, we now agree with your position on that legal question, and now here's a new notice and comment? I have not seen a case like this one where they said they were not going to do it, they were precluded from doing a cost-benefit analysis, and then did a 300-page- That's precluded from doing it, but the statute didn't require it. That's a different thing. They said they were precluded from doing it. That was- But the statute doesn't require it here, but it doesn't mean- No, no, they said the statute- Well, how do they say that that's not going to influence our decision? I mean, what the statute would preclude them from doing is, I think in their view, is if we thought it was gonna be very expensive, but this thing was as hazardous, I'll get out. We can just declare it not hazardous. It would preclude them from taking it into account. So this would be supplement. But I think the main issue here is their contention is that this material is not critical because they said, even though the preamble says that they considered the quantitative analysis, that they said that it was, that there was still some uncertainty that the RIA didn't take into account all of these things. And I think just the most important point on this is there are places in the RIA and in the totality of the circumstances where they specifically talk about quantitative benefits that they could take or leave in their analysis. And they did not do that with respect to all of the things that we are complaining about. And- This only matters. The procedural point only matters to the extent you would have had something useful to say. Yes, Your Honor. So would you have had anything useful to say other than with regard to the specific substantive arguments you've made on arbitrariness? In terms of the cost benefit analysis? Whatever criticism, critiques of the methodology. You've made four or five on the backend now that you've seen the methodology, points where you say the agency acted arbitrarily. Right? Yeah. I'll spot you, for purposes of this question, I'll spot you that you don't need to win those arguments to establish prejudice on your procedural point. So Your Honor, if your question is- Is there anything else? Are there other prejudicial arguments that we didn't make that we left on the cutting room floor? I think there are others. We, I think in the, within the limits of the words, we've set forth what we thought were the best ones. I think the cost, treating costs as benefits discussion that was had with Judge Rao is, I think, as illustrative or exemplary as you can get in terms of the need for notice and comment. You heard government counsel here today walk away from what we read the rule to do, which is to treat these enforcement costs as benefits. And he says, we categorically, I'm putting words in his volume, categorically, but he says, we don't think that that is an appropriate thing to do. Well, that would have been a nice conversation to have in the notice and comment process. And maybe we can disagree about what the preamble says, although I think it's pretty clear in my own mind. It says, we view the cleanup monies, again, I've written movies, but the cleanup monies as an advantage of the rule. I don't know how you can read it another way, but the point is we shouldn't be having this debate here a year later in court. And then the one final point I wanted to make was he did acknowledge that if it costs, maybe your hypotheticals, it costs $2 trillion or something, or maybe he said $2 trillion. The other thing, there's a lot of talk about the numbers. I think that's only part of it. But one thing I do want to clarify, the 18 million and the 51 million, the upper end of the ranges that we're talking about, those are annualized over 77 years. When you look at them in terms of present day costs, and it's in here, JA 535, the present value cost of the 18 million is 721 million. And the present day cost of the 51 million is 2 billion. 2 billion- With the present value of that all stream discounted. 2 billion with a B to borrow from a former colleague of yours who was invoked at Judge Kavanaugh. So I think it's important. We're not talking about Trump change here, but of course the quantitative complaints are only part of our issue. Thank you very much. Thank you very much to all council. The case is submitted.
judges: Millett; Katsas; Rao